REGAN, Judge.
Plaintiff, Jahncke Service, Inc., instituted this suit against the defendant, the City of New Orleans, endeavoring to recover $1,- *16 355.70, representing the fair market value of Safeway steel scaffolding, which was leased to the defendant for use in repairing Lyon Memorial Center, a recreational building operated by the city which was destroyed by a fire which also consumed the scaffolding. Plaintiff asserted that the contract of lease provided that the defendant “agreed to pay for all equipment damaged and/or not returned.”
Defendant pleaded the exceptions of no right or cause of action, which were overruled. It then answered and denied the validity of the contract on 'the theory that no authorized agent of the City of New Orleans had approved it, and alternatively, defendant alleged that the plaintiff’s scaffolding was destroyed by an act of God and the fire was in no way caused by the defendant’s negligence.
From a judgment in favor of the defendant predicated on a finding that the fire was in fact an act of God and dismissing plaintiff’s suit, it has prosecuted this appeal.
The record reveals that construction began on Lyon Center in 1940 in conformity with plans drawn by a firm of New Orleans architects and at that time it was intended to be a Boys’ Club. However, World War II interrupted this objective and the project was suspended. In 1946 construction was resumed, and while the plans of the architect were in the main followed, a construction superintendent employed by defendant supervised its completion and modified, to some extent, the architects’ original plans. In any event, before the center opened, the state fire marshal’s office inspected the premises and thereafter noted fourteen defects, which were ultimately remedied. The center was opened and operated approximately fourteen months when the trusses supporting the gymnasium roof buckled, apparently as the result of a hail storm or hurricane. The defendant then employed an architect to restore the premises to a safe condition.
On November 6, 1951, defendant leased scaffolding from plaintiff in order to effect repairs to the roof, which equipment was erected, used, dismantled and stored in the gymnasium upon completion of the overhead work.
On December 13, 1951, the Lyon Center was consumed by fire and the dismantled scaffolding was likewise destroyed. Hence, this suit.
It is pertinent to observe that on this day 48 workmen were employed at the center, thirty of whom were engaged in varnishing the floor and the* balance were finishing the swimming pool. It was the custom of these workmen to dispose of paint and oil soaked rags and various other inflammable materials used on the job by burning them in an incinerator, which was built against a wall of the warehouse; when the incinerator was initially erected, it was constructed with a masonry stack or vent extending above the roof of the warehouse. Subsequently a crack developed in the stack; therefore, it was removed and a new steel stack was manufactured to • replace it. Although the stack was completed it had not been attached to the incinerator on the day of the fire, thus there was an open or unvented incinerator abutting the warehouse at this time.
The warehouse is a building separate from the gymnasium; however, they are connected by a leanto structure. The distance from the gymnasium to the incinerator was 26 feet and relative to the gymnasium the incinerator was built against the outside wall of the warehouse.
Thus oriented, it is pertinent to consider chronologically the undisputed events which occurred on the day of and immediately prior to the occurrence of the fire.
At 3:10 p. m., Henry DeFraites, the construction supervisor under whose direction the building was erected and who was working at the center while it was undergoing repairs, testified that before he and his son left the building for the day, his son called his attention to a fire burning in the incinerator. He ordered two workmen *17 to extinguish the fire and remained at the incinerator until they complied with his request. This was done, DeFraites explained, because Mayor Morrison was to conduct a tour through the center later that afternoon.
However, at about 4:45 p. m., the mayor was completing the tour through the center and he noticed a fire burning in the incinerator, which apparently was then under control and created no cause for alarm.
At approximately 5 p. m., C. E. Wright, a soft drink manufacturer, whose plant is located across the street from the center on Tchoupitoulas Street, was returning to his establishment when he observed a huge blaze, apparently next to the side of the building in the vicinity of the incinerator. He explained that the reason his attention was attracted to the blaze was because the flames from the fire were lapping over the rooftop of the warehouse.
Between 6:20 and 6:30 p. m., the watchman at Lyon Center discovered smoke emanating from the warehouse in the general vicinity of the incinerator. He called this to the attention of two supervisors who were in the administration building. They both hurried to the scene, noticed smoke pouring into the building from a point near the incinerator and then notified the fire department. While the court declared the watchman incompetent to testify because “I don’t think the old gentleman knows exactly what it is all about”, the approximate time of the fire’s discovery by him was affirmed by the supervisors, Roland Caruso and William Bailey, who both testified the smoke came from the warehouse. Thereafter, the wind-swept[1] flames soon consumed most of the center’s facilities including plaintiff’s scaffolding.
Joseph B. O’Rourke, a deputy fire marshal who participated in an ensuing investigation, testified that the fire originated in wooden eaves which extended from the warehouse roof out 14 inches and directly over the open incinerator. He further asserted that the incinerator was not, constructed of fire brick, and this, coupled with other defects, made the incinerator unacceptable as a properly fireproofed construction.
E. Jack Hoffstadt, another investigating deputy fire marshal, described the incinerator in detail. The wall against which it was built and which also served as a wall for the incinerator was constructed of four inch brick veneer, and behind this single layer of bricks was a wood wall. Hoffstadt said that while the lower brick wall of the incinerator was intact after the fire, the upper portion had burned and the wooden eaves which had extended over the incinerator from the roof were also burned. He emphatically stated that the fire marshal’s office would never approve as safe such construction.
To rebut the allegations of faulty construction, defendant relied primarily on the testimony of DeFraites, the building supervisor, who, in effect, acted as a general contractor for the city. He maintained that there were no wooden eaves extending from the warehouse over the incinerator, that fire bricks were used in the incinerator’s construction and that it was adequately fireproofed. However, DeFraites did concede that the steel smoke stack which had been especially constructed for the incinerator and which was to extend to a height four feet above the building’s roof, was necessary from the standpoint of adequately protecting the building from fire.
Counsel for plaintiff insists that the record is replete with proof of the defendant’s negligence and the trial judge erred in not so finding.
Defendant, conversely, argues that plaintiff must establish by a preponderance of the evidence the origin of the fire and the *18 defendant’s negligence in connection therewith and this plaintiff has failed to do.
The law is quite clear on the obligations of le'ssee to lessor and/or the obligations of bailee to bailor. The general. rule of liability in connection therewith is encompassed by LSA-Civil Code, Article 2721, which reads:
“The lessee is only liable for the injuries and losses sustained through his own fault.”
And in the event there is a loss of lessor’s goods while in the possession of lessee during and as the result of a fire, LSA-Civil Code, Article 2723 is even more explicit. It reads:
“He can only be liable for the destruction occasioned by fire, when it is proved that the same has happened either by his own fault or neglect, or by that of his family.”
The jurisprudence is also quite clear relative to the interpretation of these articles, an excellent summary thereof appears in a decision rendered by the Supreme Court of Louisiana [2] in 1938:
“A bailee who fails to return the property according to the contract of bailment is liable to the bailor for the value of the property unless the bailee shows that the property was lost or destroyed without fault or negligence on his part. * * * But, when the bailee shows that the property was destroyed by fire, and there is nothing in the showing made by the bailee to indicate that there was fault or negligence on his part, the burden of proof rests upon the bailor to show that there was fault or negligence on the part of the bailee. ¡K Hí H; »
The trial judge obviously concluded that the plaintiff failed to carry the burden of proof so as to establish any negligence on the defendant’s part, in conformity with the foregoing requirements of the Civil Code and the jurisprudence interpretative thereof.
The only question posed for our consideration on appeal is whether that finding of the trial judge is so erroneous and unsupported by the evidence as to warrant a reversal by us.
After a careful analysis of the record, we are convinced that the trial judge did err, for the record is replete with an abundance of proof furnished by plaintiff, and, as paradoxical as it may appear, by the defendant itself, reflecting defendant’s negligence. The testimony of defendant’s own agent emphatically established that debris and highly combustible materials were burned in the incinerator on a windy afternoon without careful supervision. DeFraites, the construction supervisor, conceded that he considered it necessary to have a stack extending from the incinerator above the warehouse roof as a necessary fire prevention safeguard. Yet, without the stack, the incinerator was used to dispose of oil soaked rags and other inflammable debris accumulated from work performed by 48 men in the course of the day without close supervision of the “stackless” incinerator while the material was being burned.
We are convinced that the fire originated at a point above the incinerator in wooden eaves which supported the roof of the warehouse. Not only did the investigating fire marshals pinpoint this location as the origin, but the playground supervisors who observed the fire in its initial stages first noticed billows of smoke pouring into the warehouse building at a point near the incinerator. It will also be recalled that C. E. Wright, an independent witness, observed a large blaze against the warehouse wall, which was in the immediate vicinity of the incinerator, and the flames therefrom were lapping over the rooftop thereof.
*19 Counsel for defendant, in the last analysis, insists that the contract between it and the plaintiff was invalid for want of proper authorization by the city’s agent. In view of the fact that the record reveals that the material was ordered by the city in conformity with DeFraites instructions, used for the city’s benefit, and that rent was paid thereon for a period of one month, we find no merit in this contention. Even though the contract may have been invalid at its inception, it was later ratified by the city through the actions of its agents.
For the reasons assigned, the judgment appealed from is reversed, and it is now. ordered, adjudged and decreed that there be judgment in favor of the plaintiff, ■ Jahncke Service, Inc., and against the defendant, the City of New Orleans, for the full sum of $1,355.70, plus legal interest from judicial demand and for all costs of suit.
Reversed and rendered.

. Mayor Morrison testified in part as follows ; “ * * * it was a cold windy afternoon * * The mayor was describing weather conditions he observed less than two hours before the fire was discovered.

. Poydras Fruit Co. v. Weinberger Banana Co., 1938, 189 La. 940, 181 So. 452, 454.